IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| ROGER KNIGHT, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | Civil Action No. 15-1520 |
| | ) | |
| v. | ) | |
| | ) | Judge Cathy Bissoon |
| SLIPPERY ROCK UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

### I. MEMORANDUM

Pending before the Court are cross Motions for Summary Judgment filed by Plaintiff Roger Knight (**Doc. 27**) and Defendant Slippery Rock University (**Doc. 31**). For the following reasons, Defendant's Motion for Summary Judgment (**Doc. 31**) will be GRANTED, and Plaintiff's Motion for Summary Judgment (**Doc. 27**) will be DENIED.

**BACKGROUND**

Roger Knight ("Plaintiff") filed this lawsuit against his former employer, Slippery Rock University ("Defendant"), alleging unlawful retaliation under Title VII of the Civil Rights Act of 1964. Specifically, Plaintiff claims that Defendant fired him for participating in an investigation of charges filed with the EEOC by two employees of the Slippery Rock Police Department. (Compl. ¶¶31-33).

The generally undisputed facts of the case are as follows:

Plaintiff was employed by Defendant from around 1997, until his termination on March 6, 2014, holding various positions within the university's police department before becoming Parking Manager in 2012. (Def.'s Stmt. of Facts (Doc. 33) at ¶3; Pl.'s Counterstatement of

1

Material Facts (Doc. 39) at ¶3; Pl.'s Stmt. of Facts (Doc. 29) at ¶2). Prior to becoming Parking Manager, Plaintiff was Captain with Defendant's police department, during which time a Slippery Rock information technology ("IT") employee set up Plaintiff with "administrator rights" to Slippery Rock Police Department and Parking Office's local computer server. (Doc. 33 at ¶¶13, 35-36; Doc. 39 at ¶¶13, 35-36; Doc. 29 at ¶3). As an administrator, Plaintiff had access to a shared server that was to be used for business functions, including folders for individual officers that are otherwise only accessible by that officer. (Doc. 33 at ¶45; Doc. 29 at ¶¶10-11).

In September and October of 2011, two employees of the Slippery Rock Police Department, Caitlin Corrigan and Koah Pentz filed discrimination claims with the EEOC against Slippery Rock based on allegations against Plaintiff, ultimately bringing complaints in federal court. (Doc. 33 at ¶¶23-25; Doc. 39 at ¶¶23-25). In January 2013, Plaintiff received litigation hold letters from Defendant's internal legal counsel relating to Corrigan and Pentz's lawsuits, instructing Plaintiff to preserve and maintain all information he had in his possession, custody or control relating to the lawsuits. (Doc. 33 at ¶¶26, 29: Doc. 39 at ¶¶26, 29). Plaintiff also received letters in December of 2013 reminding him of his continuing obligations regarding the litigation holds. (Doc. 33 at ¶¶28, 31: Doc. 39 at ¶¶28, 31). Plaintiff did not understand anything in the litigation hold letters or the reminder letters as instructing him to access the files of other members of Slippery Rock's Police Department, nor did anyone ever instruct Plaintiff to access such files. (Doc. 33 at ¶¶61-64; Doc. 39 at ¶¶61-64).

Nevertheless, between June 4, 2012 and January 10, 2014, while Plaintiff was Parking Manager and no longer Captain, Plaintiff accessed a number of files belonging to Officers Corrigan, Pentz, Frank Davis and Assistant Chief Windy Stafford. (Doc. 33 at ¶54; Doc. 39 at

¶54). Plaintiff stated that he accessed these files because he was told to provide information that would "help [Slippery Rock] win this case." (Doc. 33 at ¶53; Doc. 39 at ¶53). He also stated that he accessed the files of Officer Davis and Assistant Chief Stafford to find documents that could bolster Slippery Rock's defense. (Doc. 33 at ¶65; Doc. 39 at ¶65). Plaintiff did not provide any information that was harmful to the defense of Slippery Rock in the Corrigan or Pentz lawsuits and testified that he "was going to be probably their best witness as to defending [the Corrigan lawsuit]." (Doc. 33 at ¶¶66, 67; Doc. 39 at ¶¶66, 67).

On October 18, 2013, Plaintiff showed his supervisor, Chief Michael Simmons, a document prepared by Corrigan addressed to Chief Simmons, and Plaintiff asked the Chief what he intended to do about the allegations Corrigan made against Plaintiff. (Doc. 33 at ¶¶68-69; Doc. 39 at ¶¶68-69). After, Chief Simmons reported Plaintiff's possession of the files to Defendant's Assistant Vice President for Human Resources, Lynn Motyl, and internal legal counsel, and together they decided that Simmons would try to determine how Plaintiff had accessed these files. (Doc. 33 at ¶78; Doc. 29 at ¶78). When Simmons was unsuccessful, Defendant hired a third-party forensics expert, Bit-x-Bit, to investigate Plaintiff's access of the documents. (Doc. 33 at ¶80; Doc. 39 at ¶80). Plaintiff was suspended with pay in January 2014, while the investigation was ongoing. (Doc. 33 at ¶83; Doc. 39 at ¶83). Bit-x-Bit issued a report on February 7, 2014, indicating what files Plaintiff accessed, when he accessed them, when his permissions were created, and providing recommendations of limiting Plaintiff's access and creating an administrator rights policy. (Doc. 29 at ¶27). Bit-x-Bit reissued the report on February 11, 2014 without the recommendations at the request of Defendant. (Doc. 29 at ¶28).

Following the report, Plaintiff was called in for two pre-disciplinary conferences. The first was on February 13, 2014, during which Plaintiff was asked to turn over all the documents

he had accessed, to which he refused. (Doc. 33 at ¶85; Doc. 39 at ¶85). However, Plaintiff did turn over some documents after the conference. (Doc. 33 at ¶86; Doc. 39 at ¶86). Then, at a second conference on February 25, 2014, Plaintiff provided additional documents he had not provided previously. (Doc. 33 at ¶¶87-88; Doc. 39 at ¶¶87-88). Plaintiff was terminated on March 6, 2014. (Doc. 33 at ¶89; Doc. 39 at ¶89).

Defendant identified several reasons for Plaintiff's termination in his termination letter. First, Slippery Rock determined that Plaintiff violated Slippery Rock's Policies Concerning Computer Use "by failing to act responsibly, use good judgment and exercise civility, and understand the appropriate use of assigned IT resources." (Doc. 34, Ex. 3). Additionally, Plaintiff's "unauthorized access of folders for other Officers was not for purposes of university coursework, university research projects, university employment activities or university communications, but rather for your own personal gain" in violation of the same policy. Id. Furthermore, Plaintiff had to "remote in," or separately log in, to view the information that he did, suggesting he knew of his administrator access. Id. And finally, Plaintiff did not fully cooperate with the investigation by handing over all of the documents he had gathered. Id. Therefore, Plaintiff could no longer be trusted as Parking Manager. Id.

Plaintiff has highlighted several inaccuracies in the termination letter. First, Lynn Motyl, who wrote the letter, later testified that she was not sure what personal gain Plaintiff received from his access of these files. (Doc. 29 at ¶31). Ms. Motyl also testified that Defendant lacked any policy regarding administrator rights, that she was aware that Plaintiff was accessing the documents as part of the ongoing litigation against Defendant, and that the reason for Plaintiff's termination was the "multiple access" of certain documents. (Doc. 29 at ¶¶32-35). Furthermore, she testified that Mr. Knight's actions were akin to an employee who accesses the desk of

4

another employee without permission, and she identified two examples of that situation in the past: one in which a janitor removed files from the Vice President's desk, and a second when Chief Simmons accessed Plaintiff's desk attempting to find out how Plaintiff had access to certain files. (Doc. 29 at ¶¶41-46). The janitor was disciplined, but not fired, and Chief Simmons was "counseled." (Doc. 29 at ¶44-48). Ms. Motyl made the final decision to terminate Mr. Knight. (Doc. 29 at ¶36).

## **ANALYSIS**

Title VII of the Civil Rights Act of 1964 prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. §2000e-3(a). In analyzing Title VII retaliation claims that are not supported by direct evidence, the Court of Appeals for the Third Circuit employs the burden-shifting framework laid out in McDonnell Douglas Corp. v. Green: (1) first, the plaintiff must state a prima facie case of discrimination or retaliation; (2) then, the burden shifts to the employer to advance a legitimate, non-discriminatory reason for the adverse employment action; (3) and finally, the plaintiff is afforded an opportunity to show that the employer's proffered reason is pretextual. 411 U.S. 792 (1973).

As discussed below, the Court finds that Plaintiff cannot state a prima facie claim of retaliation because he did not engage in any protected activity. Even if he had, Defendant has offered a legitimate, non-discriminatory reason for terminating Plaintiff's employment, which Plaintiff has failed to demonstrate was a pretext for retaliation. Accordingly, the Court will grant Defendant's Motion for Summary Judgment.

5

A.   **Plaintiff Did Not Engage in a Protected Activity**

The Court finds that Plaintiff has not met his prima facie burden. To state a prima facie case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected employee activity under Title VII; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the activity and the adverse action. Slagel v. County of Clarion, 435F. 3d 262, 265 (3d Cir. 2006). Conceding that the second and third elements may be satisfied, Plaintiff's participation in the investigation is not protected because he admittedly was defending his employer *against* the discrimination claims filed with the EEOC, as opposed to supporting the allegedly aggrieved employee.

As a general matter, the Court of Appeals for the Third Circuit endorses broad protections under the participation clause. See Slagel, 435 F 3d. at 266 (quoting Pettway v. American Cast Iron Co., 411 F.2d 998, 1006 (5th Cir. 1969) ("the participation clause provides 'exceptionally broad' protection for employees covered by Title VII")). However, it also is well established that an employee who opposes *or participates* in a proceeding against an employer's activity must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII, in order to be afforded protection. Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006). See also, Clark County v. Breeden, 532 U.S. 268, 271 (2001); Fleeger v. Principi, 221 Fed. Appx. 111, 115 (3d Cir. 2007); Theriault v. Dollar Gen., 336 Fed. Appx. 172, 175 (3d Cir. 2009). This exposes the counter-intuitive nature of Plaintiff's assertions. Not only does he not have a good faith belief that the underlying employer conduct is unlawful, but he does not oppose the underlying discrimination. Indeed, he was the subject of the complaint.

The Court of Appeals for the Seventh Circuit addressed a similar situation in Twisdale v. Snow, where it held that an employee participating in a Title VII case in opposition to the discrimination claims of a co-employee was not protected under the participation clause.[1] Affirming summary judgment for the employer, the court writes:

> The statute has the limited purpose of preventing certain forms of discrimination. The retaliation provision backs up this central thrust by protecting employees who invoke the statutory machinery for rectifying violations. We cannot find any hints . . . of any purpose of protecting employees whose resistance to charges of discrimination made by their coworkers provokes the employer's ire. . . Perverse and absurd statutory interpretations are not to be adopted in the name of literalism.

Twisdale v. Snow, 325 F.3d 950, 952-53 (7th Cir. 2003). See also Paffhausen v. Bay County Library Sys., 2008 WL 1882694 (E.D. Mich. Apr. 24, 2008) (interpreting a similar Michigan statute to require a plaintiff's investigation be in support of the person opposing the underlying violation to receive protection); Whatley v. UPS, 2009 WL 3756624 (E.D. Mo. Nov. 6, 2009); but see Kelley v. City of Albuquerque, 542 F.3d 802, 815 n. 11 (10th Cir. 2008) (rejecting Twisdale as impermissibly invoking the absurd results doctrine).[2]

---

[1] Plaintiff mistakenly argues that Twisdale "suggests" protection "might" not extend to a plaintiff opposing discrimination claims, but that the case was decided on other grounds; however, the lower court's ruling against Twisdale's retaliation claim was in fact upheld on the ground that actions in opposition to discrimination claims could not receive protection. Twisdale, 325 F.3d 950. Summary judgement was granted against Twisdale's own discrimination claim on the ground that he had not suffered an adverse employment action. Id.

[2] In Kelley, the Tenth Circuit stated that to justify a departure from an unambiguous statute, the absurdity of a literal reading "must be so gross as to shock the general moral or common sense" (citations omitted). 542 F.3d at 815 n. 11. However, the restrictions on the Court may not be so stringent. See Public Citizen v. U.S. Dept. of Justice, 491 U.S. 440, 454 (1989) ("Where the literal reading of a statutory term would 'compel an odd result' (internal citations omitted), we must search for other evidence of congressional intent to lend the term its proper scope"); Watt v. Alaska, 451 U.S. 259, 266 (1981) ("The circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect"). Regardless, the assertion that a law enacted to combat employment discrimination would protect employees who seek to suppress the rights granted by the act is sufficiently shocking to common sense to allow for alternative interpretations. Furthermore, the

7

Here, Plaintiff has conceded numerous times that he was participating in the EEOC investigation in support of his employer, Slippery Rock. (Doc. 33 at ¶¶53, 65-67; Doc. 39 at ¶¶53, 65-67). Therefore, it would run counter to the purpose of the Act, to the reasoning in Twisdale, and to the Court of Appeals for the Third Circuit's "reasonable belief" requirement to find that Plaintiff was engaged in a protected activity. For this reason alone, the Court would grant Defendant's Motion for Summary Judgment. As discussed below, however, even if Plaintiff had engaged in protected activity, the Court would still grant Defendant's Motion as Defendant has offered a legitimate, non-discriminatory basis for Plaintiff's termination; a basis Plaintiff has failed to rebut.

### B.     Defendant has Offered a Legitimate, Non-retaliatory Reason for Termination

In offering a non-retaliatory reason for termination, an employer's burden of production is relatively light and is satisfied by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). For example, policy violations are generally deemed legitimate, non-discriminatory reasons for termination. Carey v. Fed. Express Corp., 519 Fed. Appx. 772, 776 (3d Cir. 2013); Davis v. Solid Waste Servs., 625 Fed. Appx. 104, 106 (3d Cir. 2015). Additionally, even when an employee engages in a protected activity, violating employer policies while engaging in that activity can be a distinct, legitimate non-discriminatory reason for termination. In a factually similar case to this, Vaughn v. Villa, an employee filed

---

Third Circuit's requirement that plaintiffs in both participation and opposition cases have objectively reasonable beliefs, in good faith, that the underlying actions they oppose are unlawful inherently suggests that an employee supporting an employer should not be protected. At the very least, it reveals that courts in the Third Circuit should be more inclined to adopt the reasoning in Twisdale than the reasoning in Kelley.

charges with the EEOC and provided unredacted medical records to the EEOC as part of the investigation. 537 F.3d 1147 (10th Cir. 2008). The employee was then fired for violating a confidentiality policy when she disclosed the records, which the Court of Appeals for the Tenth Circuit upheld as a legitimate, non-discriminatory reason for termination. Id.

Here, Defendant identifies several reasons for termination in Plaintiff's termination letter, but its core assertion is that Plaintiff was fired for violating its Policy Concerning Computer Use by inappropriately accessing the files of other officers in the Slippery Rock Police Department. (App. Ex. 3). This alleged policy violation is similar to those in Carey, Davis and Vaughn, and is a legitimate, non-discriminatory basis for Plaintiff's termination. Notably, even if Mr. Knight were engaged in a protected activity when he accessed the files, his potential violation of Slippery Rock's Policy Concerning Computer Use is a separate, non-discriminatory reason for termination, similar to Vaughn. Therefore, the reason offered satisfies Defendant's relatively light burden of offering a legitimate, non-discriminatory reason for termination.

### C. **Plaintiff has Failed to Demonstrate that Defendant's Legitimate Reason was Pretextual**

Given that Defendant has met its burden of offering a legitimate, non-discriminatory basis for termination, the burden shifts back to Plaintiff to show that the reasons offered by Defendant are merely a pretext for discrimination. To defeat summary judgment at the pretext stage, a plaintiff must point to some evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Fuentes, 32 F.3d at 764 (citations omitted). However, a plaintiff cannot simply show that the employer's decision was wrong or mistaken. Id. He must provide evidence to show that the reason offered by the employer "was so plainly wrong that it cannot have been

9

the . . . real reason, Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997), and that the real reason was thus discriminatory animus." Brasher v. Thomas Jefferson Univ. Hosp. Inc., 676 Fed. Appx. 122, 126 (3d Cir. Jan. 27, 2017).

Plaintiff relies heavily on the first prong of the Fuentes test, but he is unable to produce sufficient evidence from which a reasonable factfinder could disbelieve the legitimate reasons offered by Defendant. He argues:

> (1) Plaintiff was given access to the files by Defendant, and, thus, it is unclear whether he actually violated Defendant's policies;
>
> (2) Plaintiff's termination letter suggests Plaintiff had to separately log-in to view the documents, which Ms. Motyl, Defendant's Assistant V.P. for Human Resources, later testified may not be true;
>
> (3) the termination letter suggests Plaintiff accessed the files for personal gain, but Ms. Motyl later testified that she was unsure whether he achieved any personal gain;
>
> (4) and, generally, Defendant's reasons for termination are shifting.

(Doc. 38 at pp. 6-7).

While Plaintiff has identified several potential inconsistencies, they are immaterial and nothing he has pointed to undermines the central assertion that Plaintiff was fired for inappropriately accessing files of other police officers. (Doc. 29 at ¶32; App. Ex. 3). Showing that the employer was wrong is not enough to survive summary judgment. Plaintiff must show that the reason offered was so plainly wrong it could not have been the real reason for termination, and he has failed to meet that burden here.

In fact, nothing Plaintiff has identified would lead a reasonable factfinder to question that Plaintiff was fired for inappropriately accessing the files of other officers. It was only after Chief Simmons became aware of Plaintiff's possession of personal communications between Corrigan and Simmons that Defendant began investigating how Plaintiff came to possess these files. (Doc. 33 at ¶¶27, 30, 76-78; Doc. 39 at ¶¶27, 30, 76-78). Additionally, when Defendant hired

10

Bit-x-Bit and investigated Plaintiff's conduct, it appeared singularly concerned with what files Plaintiff accessed and when. (Doc. 33 at ¶80; Doc. 29 at ¶27). There is no evidence that Defendant was at all concerned with what files Plaintiff disclosed as part of any investigations. Furthermore, Ms. Motyl's testimony, which Plaintiff relies on to identify inconsistencies in the termination letter, is consistent regarding the core rationale that Plaintiff was fired for his "multiple access" of certain documents, not for his participation in the investigation. (Doc. 29 at ¶¶32, 34). And lastly, since Plaintiff was participating in defense of Defendant, it is nonsensical that Defendant would retaliate against him for his participation in the lawsuits, particularly when a far more reasonable explanation is offered: that Plaintiff was fired for accessing the files of other officers without authorization.

A plaintiff still might demonstrate pretext under the second prong of the Fuentes test by demonstrating that similarly situated persons, not in the plaintiff's protected class, were treated more favorably. Fuentes, 32 F.3d at 764. Relying on a statement by Ms. Motyl that Plaintiff's actions were similar to an employee who removes items from the desk of another employee without permission, Plaintiff briefly argues that a janitorial employee and Chief Simmons were similarly situated to Plaintiff and were not terminated. (Doc. 29 at ¶¶43-45, 46-48).

The Court finds, however, that these other employees were not similarly situated to the Plaintiff. "While 'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.'" Opsatnik v. Norfolk S. Corp., 335 F. Appx. 220, 222-23 (3d Cir. 2009) (quoting Holifield v. Reno, 115 F. 3d 1555, 1562 (11th Cir. 1997). "A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." Wilcher v. Postmaster Gen., 441 F. Appx. 879, 882 (3d Cir. 2011). In

11

large part, Plaintiff's termination letter bases Plaintiff's termination on his violation of the Policy Concerning Computer Use and his failure to act responsibly regarding IT resources. In removing items from the desks of other employees, neither the janitor nor Chief Simmons violated the acceptable use policy or irresponsibly used IT resources. Additionally, a janitor's job responsibilities and level of accountability with respect to confidentiality and use of IT resources are not comparable to Plaintiff's in his position as Parking Manager. Finally, Chief Simmons was acting on advice of counsel and HR when he accessed Plaintiff's desk, and Plaintiff concedes that no one instructed him to access the files that he did. (Doc. 33 at ¶¶61-64, 78; Doc. 39 at ¶¶61-64, 78). The two situations identified sufficiently differ from Plaintiff's such that no reasonable jury could conclude that it is more likely than not that a discriminatory purpose influenced the decision to terminate.

Because Plaintiff has failed to provide direct evidence that Defendant was motivated by retaliatory purposes, has not identified any similarly-situated persons whom Defendant treated more favorably and has only identified inconsistencies in Defendant's reasons for termination that are immaterial to the central reasons offered, he has failed to show that Defendant's legitimate, non-retaliatory reasons for termination were pretextual.

## II. ORDER

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. 31) is GRANTED, and Plaintiff's Motion for Summary Judgment (Doc. 27) is DENIED. A Judgment Order pursuant to Federal Rule of Civil Procedure 58 will follow.

IT IS SO ORDERED.

September 12, 2017

s/Cathy Bissoon  
Cathy Bissoon  
United States District Judge

cc (via ECF email notification):

All counsel of record